## Palmer's Appeal.

1. A. and B., who were the patentees and owners of a patent assigned their interest to a firm of which B. was a member, and in consideration therefor the firm agreed to pay to A. a royalty on the articles manufactured under the patent. The patent had been recently obtained and had not been fully tested. There was no warranty as to its utility: *Held*, that as no fraud was alleged the firm assumed the risk of the success of the patent, and while perhaps they were not bound to persevere in its use to their own detriment, it was very clear that if they employed the patented process or any part thereof, they were bound to account according to the terms of the agreement.

2. The contract was entire and indivisible, and the firm having availed themselves of at least a part of the patented process should account and pay as provided in the contract.

November 4th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, TRUNKEY and STERRETT, JJ. PAXSON and GREEN, JJ., absent.

Appeal from the Court of Common Pleas, No. 1, of *Allegheny county:* Of October and November Term 1879, No. 345. In Equity.

Bill in equity filed by Jane T. Palmer, administratrix of George Palmer, deceased, against Charles W. Hubbard, James Lippincott, Thomas Bakewell, William Frew, David M. Long and Charles Lockhart, partners, doing business as Hubbard, Lippincott, Bakewell & Co.

Plaintiff filed her bill, alleging: 1st. A contract between her intestate and defendants, of date September 2d 1871, whereby defendants, who are proprietors and operators of a large and extensive axe factory, situate in the city of Pittsburgh, bound themselves to pay to the other party to the contract a royalty of one cent upon each axe manufactured by them by the process described in certain letters patent therein referred to which had been issued to said George Palmer and C. W. Hubbard, one of defendants, jointly. 2d. That defendants had manufactured axes, &c., by said process, and, 3d. That defendants had not paid the royalty agreed upon to plaintiff's intestate, nor to her as his representative, and praying that an

[Palmer's Appeal.]

account be taken of the number of axes manufactured under said process, and that a decree be entered that defendants pay to her said amount.

Defendants answered, admitting the execution of the articles of agreement, but denying that they had ever manufactured either axes or hatchets under said process, and denying any liability to pay royalty to plaintiff. A copy of the agreement was attached to the bill and the letters patent were put in evidence.

After taking much testimony the case was referred to a master, S. A. McClurg, Esq. The material portions of his report, together with the other facts, will be found stated in the opinion of this court. The case was heard upon exceptions to the master's report, when the court dismissed the bill, the costs to be equally divided between the parties. From this decree Jane T. Palmer took this appeal.

*S. M. Raymond* and *D. T. Wilson*, for appellant.—The article of agreement between the decedent and respondents contains no covenant or warranty as to the value of the dies covered by the patent, nor their success in the manufacture of axes, nor as to the quality of the axe when manufactured. There is no allegation of any fraud or misrepresentation by Palmer. On the contrary with full knowledge of what this patent was the respondents entered into the contract. Hubbard, their co-partner was one of the patentees. The agreement did not require the respondents to manufacture under the patent, but it did contain a covenant on the part of respondents to pay one cent for every axe manufactured by respondents by the process of the patent. Mere inadequacy of consideration is never a good defence to agreements in reference to patent rights : Bellas *v.* Hayes, 5 S. & R. 440 ; Eureka Co. *v.* Baily Co., 11 Wall. 491 ; Birdsall *v.* Perys, 5 Blatch. 255 ; Lawes *v.* Purser, 6 E. & B. 930 ; Hall *v.* Condor, 2 C. B. (N. S.) 20 ; Steam Packet Co. *v.* Sickles, 10 How. 419 ; Kinsman *v.* Packhurst, 18 Id. 293 ; Wilder *v.* Adams et al., 2 Wood. & M. 329 ; Pitts *v.* Jameson, 15 Barb. 310 ; Thomas *v.* Quintard, 5 Duer 80 ; Banks *v.* Stolly, 3 McLean 523 ; Stowe *v.* Bluy, 2 B. & Ald. 456.

If then the respondents under this agreement and this patent saw fit to manufacture over 800,000 axes, and could by the assignment and agreement have defended to a claim for infringement by Palmer, and the respondents still use and hold the patent, and never rescinded their contract, must they not pay the royalty agreed upon ?

If a party would rescind a contract he must do it *in toto.* He cannot disclaim it in part and enforce it in part ; where the contract is entire the consideration cannot be severed by one : Minor *v.* Bradley, 22 Pick. 457. If the consideration is single the con-

tract is entire whatever the number or variety of the items embraced in its subject: McClurg *v.* Price, 9 P. F. Smith 420.

It cannot be argued that the use of the dies was experimental when the trials thereof extended over two years.

*George Shiras, Jr.*, for appellees.—Charles W. Hubbard, one of the defendants, was joint patentee with George Palmer, and the defendants are assignees of Hubbard.    Therefore, independent of the agreement in question, the defendants had a clear right to use the patent, and this without any liability to account to George Palmer or his personal representative : Curtis on Patents, sect. 191 ; Clum *v.* Brewer, 2 Curtis Cir. C. R. 506, 524 ; Mathers *v.* Green, Law Rep., 1 Eq. 29.

The evidence shows that the use of the dies was experimental. But, it is said, it was too prolonged to be fairly experimental.    It must, however, be remembered that the defendants had a large sum of money invested in this enterprise.    Furthermore, the experiments were encouraging and the defendants were hopeful of ultimate and complete success.    Again, if they had succeeded in getting this pair of dies to perform their desired function, they might reasonably expect and did hope to succeed with the finishing dies.    For a considerable part of the time in question George Palmer was in the service of the defendants at an annual salary of $2000, his sole employment being to superintend the defendants' experiments with this patent.    Fair dealing to George Palmer required the defendants to give the patent a full trial.    The experiments with dies in the end proved unsuccessful, and this part of the patent, like the other steps in the patented process, was demonstrated to be a failure, and had to be abandoned.

Mr. Justice STERRETT delivered the opinion of the court, November 26th 1880.

The claim of appellant, as presented in her bill, is based on the written agreement of September 2d 1871, between her intestate, George Palmer, and the appellees, Hubbard, Lippincott, Bakewell & Co., coupled with the averment that under the letters patent, referred to in the agreement, the appellees had manufactured a large number of axes and hatchets for which they refused to account and pay according to the terms of the contract.

The agreement recites that, on August 22d 1871, the letters patent for certain devices and processes to be used in the manufacture of axes, were granted by the United States to George Palmer and Charles W. Hubbard, who, on the date of the agreement, assigned their entire interest in the patent to the appellees, Hubbard, Lippincott, Bakewell & Co., of which firm, Mr. Hubbard, one of the patentees, was a member ; and that, in consideration of the assignment, the firm agreed to " keep a true and correct account of

all the axes and hatchets manufactured by them by the process described and claimed in said letters patent, and on the first day of July and January in each and every year during the term of said letters patent, after the first day of January 1872, render unto the said Palmer a true and correct statement of the number of axes and hatchets manufactured by the process aforesaid, and pay him as royalty one cent for every axe and hatchet so manufactured by them." The contract also provides that the parties shall agree on such sums as to them shall appear reasonable to be paid as royalty on axes and hatchets made between the date of the assignment and the first day of January 1872.

There was no question as to the execution of the agreement; and the master found, inter alia, that the appellees experimented in the use of all the processes included in the patent, but some of them failed to answer the purpose for which they were intended, and were not used by them in the manufacture of axes and hatchets; "that they did use the process or device indicated by figures 1, 2 and 3 in the letters patent, from the date of the agreement until July 1st 1873, welding and shaping with the drop and die in the manner described in the patent," and during that time manufactured 418,936 axes, as follows, viz.: from September 2d 1871 to January 1st 1872, 50,215 axes; from January 1st 1872 to July 1st 1872, 120,104 axes; from July 1st 1872 to January 1st 1873, 116,075 axes, and from January 1st 1873 to July 1st 1873, 132,482 axes. He also found that for 16 months, from the last-mentioned date, the appellees manufactured no axes or hatchets under any one of the patented processes or any part of them; that from November 1st 1874 until the bill was filed, they used the same die and drop only for the purpose of shaping or straightening the axe pole after welding it under the trip-hammer, but did not use the same for both welding and shaping as they had done prior to July 1st 1873; that, in consequence of frequent mis-welds, the use of the die was wholly abandoned for the sixteen months immediately preceding November 1st 1874, and was not used after that date except for the purpose of shaping or straightening the axe poles. He further found that dies for straightening, swaging and rough shaping the pole were used before the letters patent were issued, and have since been largely in use by other manufacturers.

The foregoing are the facts found by the master so far as in his opinion they were pertinent to the issue, and upon them he held that the appellees were liable to account and pay the royalty on all axes manufactured under the patent, as aforesaid, from January 1st 1872 to July 1st 1873, viz.: 368,936 axes, at one cent each with interest, from the respective dates on which accounts should have been rendered according to the terms of the agreement; but he refused to charge them with any royalty on the 50,215 axes manu-

factured between the date of the agreement and January 1st 1872, for the reason that there was no evidence before him from which he could determine how much, if anything, should be paid.

The learned president of the common pleas being of opinion that the conclusions of the master were "not sustained by the principles of equity," refused to adopt his report, and made a decree dismissing appellant's bill and ordering each party to pay one-half of the costs. This is assigned for error.

The ground on which the bill appears to have been dismissed is, that in manufacturing axes the appellees did not use the entire process described in the letters-patent, and that appellant is not entitled to any compensation for the use of such parts of the process as were employed, because they were practically valueless, and cost the appellees, in their attempt to utilize them, more than they were worth. This view of the contract we think was erroneous. The patentees first assigned their interest in the letters-patent to the firm of which one of them was a member, and in consideration thereof the firm at the same time contracted to pay Palmer the stipulated royalty for his interest in the patent. The transaction was practically a sale of the patent to the appellees, coupled with the contemporaneous agreement on their part to pay Palmer one cent for each axe manufactured under the patented process or any part of that process. There was no warranty as to the validity or utility of the patent, nor is it pretended there was any fraud in the transaction. The patent had been but recently obtained and had not then been fully tested. The appellees assumed the risk of its success. The agreement evidently contemplated the use of the patent by them in their business of manufacturing axes, and while perhaps they were not bound to persevere in its use to their own detriment, it is very clear that if they employed the patented process or any part thereof, they were bound to account according to the terms of their agreement. They might not find it advantageous to use all the mechanical devices covered by the patent ; but, according to what must be regarded as the true interpretation of the contract, the employment of one or more of them was a manufacturing " by the process described and claimed in the letters-patent." It could never have been contemplated by the parties that the omission by the appellees to employ one or more of the devices or processes described in the patent, would entitle them to use the others free of charge, or by paying therefor according to a *quantum valebant* basis. The contract is entire and indivisible, and the appellees having availed themselves of at least a part of the patented process should account and pay as provided in the contract. In the words of the learned master, " having elected to use even one of the three patented processes under the agreement, they must pay the royalty as provided therein. It is immaterial that this part of the patented process was unsatisfactory. They must pay for second as well as

first class axes manufactured in this way. The language of the agreement is " every axe manufactured." The conclusions of the master are sustained by principles recognised in the following cases, viz.: Lawes v. Purser et al., 6 E. & B. 930 ; Hall v. Condor et al., 89 E. C. L. R. 20 ; Birdsall v. Perys, 5 Blatch. 255 ; Kinsman v. Parkhurst, 18 Howard 289 ; Vaughan v. Porter, 16 Vt. 270, and Bellas v. Hays, 5 S. & R. 427. In the last case, Judge GIBSON, speaking of the uncertain value of a patent, says : " Where a particular fact is known to be doubtful, or supposed to be so, if the party to be benefited neglects to secure himself by a covenant, he will be without remedy if it turns out contrary to his expectations, for he will be considered as having paid his money for the benefit of a chance. It would seem to me that whether the invention, which is the subject of the plaintiff's patent, were valuable or not, was in its nature doubtful, and that the defendant took the risk of that matter on himself."

The master having found that the only use made of the drop and die after the 1st July 1873, was for shaping and straightening, concluded that this was not a using under the patented process. In the language of his report, " taking into account the fact found, that drops and dies were already in use for the purpose of shaping and rough-swaging, and the language of the letters-patent that the process patented is that of *shaping and welding by the same blow*, it is plain that the subject-matter of the agreement is not the use of a die simply for *shaping*, and consequently defendants' use of the drop and die for *shaping* alone is not a manufacturing of axes under the patented process." While this conclusion is not quite so clear to us as it appears to have been to the learned master, we cannot say he was in error.

On the whole we are of opinion that the conclusions of the master were quite as favorable to the appellees as they could justly claim, and that the decree recommended by him should have been adopted. The finding was that the appellees should pay appellant a royalty of one cent each on all the axes manufactured between January 1st 1872 and July 1st 1873, viz. : Three hundred and sixty-eight thousand nine hundred and thirty-six axes, amounting to ($3689.36) three thousand six hundred and eighty-nine dollars and thirty-six cents, with interest on $1201.64 thereof from July 1st 1872, on $1160.75 thereof from January 1st 1873, and on $1324.82, the residue thereof, from July 1st 1873, amounting in all, with interest to this date, to five thousand four hundred and thirty-two dollars and forty-five cents ($5432.45).

> Decree reversed ; and it is now adjudged and decreed that the appellees, defendants below, pay to the appellant, plaintiff below, the sum of five thousand four hundred and thirty-two dollars and forty-five cents ($5432.45), and that the said appellees pay the costs, including the costs of this appeal.